UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>JOSEPH BANKS | No. 08 CR 688<br><br>Judge Rebecca R. Pallmeyer |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, submits the following sentencing memorandum.

**I.    BACKGROUND**

On August 30, 2007, the defendant knocked on the back door of the First Commercial Bank with a gun in his hand. He had a plan—to gain entry into the bank and then to force tellers to lead him to the vault. The defendant knew how to plan bank robberies. He conducted surveillance beforehand, created costumes to gain entry into the banks and disguise his appearance, and hid the cash he stole in a safe deposit box to avoid detection.

An important part of the defendant's plan was instilling fear in the bank employees he encountered. The defendant's plan relied on that fear, because he wasn't merely trying to obtain the cash in the teller's drawers. He was trying to take over the bank, get into the vault, and steal hundreds of thousands of dollars. To accomplish that, the defendant terrorized the bank employees to ensure that they complied with his demands.

The defendant's plan to create fear in the hearts and minds of the bank employees succeeded. He intimidated and terrified employees at each of the four banks. For example, during the second bank robbery, bank teller DD watched as the defendant hit fellow bank employee JL over the head with a pistol, pushed him to the floor, and then hit him over the head for a second time. Then, as the defendant brandished a firearm and commanded DD to load money into his bag, DD clutched his chest, hyperventilated, turned pale, fell to the floor, and began making loud noises. DD later told the Probation Department that, at the time, he thought he was suffering from a heart attack and would die. PSR ¶ 26. Fortunately DD suffered a panic attack, not a heart attack—but the defendant achieved his goal of terrifying the bank employees into complying with his demands. While DD continues to live with the effects of his encounter with the defendant, the defendant left the bank with $317,000, which has never been recovered.

Just a week after attempting the fourth bank robbery, on September 3, 2008, the defendant was arrested. But he continued to plan and scheme after his arrest, firing multiple attorneys and forcing several delays in his trial date over a four-year period. After this Court made clear to the defendant that there would be no more delay, he fired his attorneys again and engaged in obstructive and manipulative behavior in an effort to obtain a mistrial or otherwise derail the proceedings. Nonetheless, the jury returned a guilty verdict on all counts. After the verdict was read, the defendant told the Court that he would seek "retribution" and added that "you'll hear from me."

When the defendant stood before the Court making those menacing statements, he knew that his most elaborate plan was about to be set into motion. Just five days after the verdict, the defendant removed a fake set of bars that he installed over the window of his cell, which he had broken. He placed a pile of clothing and sheets in his bed, under a blanket, to resemble a person. The defendant then climbed down 17 stories in the early morning hours, using a rope he made out of bed sheets and dental floss.

For three days, the FBI and other law enforcement agencies scoured the Chicago area looking for the defendant, diverting personnel and resources from other investigations. At the same time, the defendant's escape from the Metropolitan Correctional Center received substantial press coverage, and created alarm among Chicago area residents, including the bank employees he victimized. For example, teller DD said that the defendant's escape made him concerned that the defendant would try to locate him. PSR ¶ 26. The defendant was captured within blocks of DD's place of employment. *Id*. DD said that he is waiting for the defendant to be sentenced so he can get on with his life. *Id*.

The other victims in this case, like DD, continue to live with the trauma they suffered due to the defendant's actions. Bank employee JL, who the defendant struck twice with a pistol, quit his job on the day of the robbery and continues to suffer from post-traumatic stress disorder. PSR ¶ 25. At trial, JL testified that when he was lying down on the cold floor of the vault, he was thinking, "I don't want to die on this floor." Since then, he still experiences claustrophobia and

3

anxiety when he visits a bank. PSR ¶ 25. When the defendant escaped from prison, JL experienced a great deal of fear. *Id.* He believes that the defendant should not be allowed to re-enter society. *Id.*

A sentence of 45 years is needed in this case to reflect the seriousness of the defendant's offenses, to deter others who may consider committing violent takeover-style bank robberies or who might attempt to escape from federal prison, and to protect the public from further crimes of the defendant. The defendant victimized numerous bank employees to obtain hundreds of thousands of dollars that have never been recovered. He continued to victimize them by escaping from federal prison and then by trumpeting his exploits in the media and blaming everyone but himself for his own actions. A 45-year sentence would send the defendant and the public a clear message—repeatedly committing violent crimes and escaping from federal prison afterward will land you back in prison with a significantly longer sentence than you otherwise would have received.

## II.  APPLICATION OF § 3553(A) FACTORS

### A.  Legal Standards

The parties and the Probation Department agree that the properly calculated advisory Sentencing Guidelines range is 360 months' to life imprisonment. District courts must take the Guidelines into account in calculating a defendant's sentence. *See Booker v. United States*, 543 U.S. 220, 264-65 (2005). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Sentencing

4

Guidelines are the sole factor in Section 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, Section 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.").

The Court must also consider the factors set forth in Section 3553(a) in determining a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. In particular, Section 3553(a) requires the Court to consider, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; and (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence. *See* 18 U.S.C. § 3553(a).

These factors, taken together, weigh in favor of a 45-year sentence, which is within the advisory Sentencing Guidelines range. In particular, the nature of the defendant's crimes, his history as a career criminal, his history of committing uncharged bank robberies prior to the instant offenses, his lack of respect for the law, and the need for general and specific deterrence strongly favor such a sentence.

**B. The Nature of Defendant's Crimes Weighs Strongly in Favor of a 45-Year Sentence.**

The defendant's bank robberies were accomplished with great force and violence towards the victim bank employees that he victimized. His crimes were designed to overwhelm the bank employees with fear so that he could gain access to

5

the bank's vault. While the defendant was only able to get into the vault during two of the four bank robberies, he succeeded in terrorizing the bank employees during all four of them.

### 1. Count One – First Commercial Bank

The first bank robbery began when the defendant donned a disguise that made him look like a construction worker. He proceeded to the back door of the First Commercial Bank with a piece of wood in his hand and knocked on the door. When bank consultant JS let the defendant in, he pulled out a gun and pointed it at JS. JS backed behind a conference room table and raised his voice, shouting at the defendant in a brave attempt to warn the bank employees inside. JS called the experience "very traumatic." PSR ¶ 24.[1]

The defendant ignored JS, walking inside the bank and approaching bank employee NW. NW testified at trial that the defendant came up to her from behind and put a gun on her. She said that he got so close to her that he touched her, and that she was terrified. NW's demeanor on the witness stand indicated that, four years later, she was still affected by the events of that day. Although the defendant did not get any money from the bank, he left his mark on NW and the other victims.

### 2. Count Two – Citibank

The defendant began planning the second bank robbery days beforehand, when he went to the Village Discount Outlet and purchased the coat that he wore during the robbery. His elaborate disguise—a fake beard, a wig, sunglasses, gloves,

---

[1] The government intends to present additional evidence from JS and other victims at sentencing.

a suit, and an overcoat—made him difficult to identify. The defendant also conducted surveillance before the robbery. Bank employee JL testified that the defendant knew that he was driving a silver car, even though he parked over a block away. At trial, JL said that the defendant repeatedly insisted that JL had driven a silver car to work and told JL that he would have to drive the defendant away from the bank in his car. JL testified that he was scared to learn that the defendant had been surveilling him, and that he lied and told the defendant that he didn't drive that day because he was afraid that if he left the bank with the defendant, he would not survive the ordeal.

Once inside the bank, the defendant leaped the counter, pushed the bank employees to the ground, and forced them to open the vault for him. Bank teller EG testified that he tried to look at the defendant's face so he could identify him, and that he tried to slow down at one point, to delay the defendant. EG said that the defendant told him "I'm not playing around," as he pointed the gun at EG. EG testified that he immediately sped up in response. He didn't want to die.

JL testified—and the surveillance video shows—that the defendant hit him on the head twice with the side of the gun. Once he was already on the ground, the defendant pushed him further into the ground by hitting him on the head with the gun. JL testified that when he was lying down on the cold floor of the vault, he was thinking, "I don't want to die on this floor."

After the defendant struck JL, fellow bank employee DD clutched his chest, hyperventilated, and fell to the floor suffering from a panic attack. JL testified that

7

at that point, he thought that DD had died—and DD later told Probation that he thought he was suffering from a heart attack and would die. PSR ¶ 26. JL then asked the defendant what he could do to get him out of there. The defendant ordered JL to assist EG in getting the money into his bag, and he complied.

While JL and EG loaded the cash into the defendant's bag, a customer entered the bank and approached the counter. The defendant moved towards the customer and grabbed him with one arm, violently dragging the customer over the counter and pushing him to the ground. The defendant then shoved the customer into the vault. As the surveillance video depicts, the customer didn't get up from the ground, even after the defendant left the bank. He was paralyzed with fear.

The defendant left the Citibank branch with $317,000. None of that money was ever recovered. What the defendant left behind were victims that still bear the scars from that ordeal. JL quit his job at Citibank that same day, and it took him several months to find a new job, which forced him to move because he couldn't afford his lease. PSR ¶ 25. JL suffers from post-traumatic stress disorder and still experiences claustrophobia and anxiety when he visits a bank. *Id*. Later, when the defendant escaped from prison, JL experienced a great deal of fear. *Id*.

DD has tried to put the experience behind him, even though he thought he was going to die on that day. PSR ¶ 26. But when the defendant escaped from prison, DD worried that the defendant was trying to locate him. *Id*. He noted that the defendant was captured within blocks of his current place of employment. *Id*.

### 3. Count Three – Citibank

Unlike the prior two robberies, the defendant entered Citibank on July 19, 2008 wearing a black stocking mask that obscured his entire face. From a distance, both in person and in the surveillance video, the defendant's face looked pitch black due to the mask he wore. That mask, and the gun wielded by the defendant, terrified bank employees when the defendant jumped over the counter and pointed the gun at them.

At trial, bank employee AS described how the defendant put the gun to her head, just inches away. She said that when she didn't move fast enough for him, he put the gun right up against her head. AS's demeanor on the witness stand spoke volumes. Even though it had been over four years since the robbery, she was clearly overcome with emotion and had to pause multiple times during her testimony. She could barely describe the robbery without showing the kind of emotion she felt and how deeply it affected her. The force and violence of the defendant still affects AS today.

After the defendant forced AS and another employee to open the vault and load money into his bag, he left the bank with $272,000 in cash. Fortunately, the government recovered $42,000 that the defendant cleverly hid in a safe deposit box. However the remaining $230,000 has never been recovered. The defendant spent some of the money on several vehicles, and the evidence at trial established that the defendant deliberately structured the transactions to ensure that he paid less than $10,000 in cash up front.

### 4. Count Four – Chase Bank

The defendant also carefully planned the robbery of the Chase Bank branch on August 26, 2008. Fortunately, he did not recover any money during that robbery because he didn't count on a very alert painter, JP, who was standing near his truck on a break from the work he was doing in the bank. JP noticed that the defendant's demeanor was unusual and he closely watched the defendant. In response, the defendant drew a gun on JP and led him into the bank at gunpoint.

At trial, JP testified that as the defendant marched him into the bank at gunpoint, all he could think about was whether he would ever see his children again. The defendant changed JP's life—he went to work that day to paint the bank, but ended up fearing that he would never see his children again. JP told Probation that the defendant "scared the hell out of me." PSR ¶ 27. He was afraid that the defendant was going to shoot him. *Id*.

The defendant's plan was foiled when he turned away from JP for a split second, giving JP a chance to run for his life. JP ran at full speed through the lobby yelling, "He's got a gun! Call 9-1-1!" He kept on running for his life, right out the front door of the bank.

Thanks to JP, the defendant didn't get any money that day. But JP got something from the defendant—emotional trauma. JP continues to experience anxiety when individuals stand behind him and when he performs painting jobs at banks. PSR ¶ 27. JP called the defendant a "terrorist" and said he should receive a sentence of life imprisonment. *Id*.

The victims of the defendant's crimes have such strong feelings about him because the defendant designed his crimes to create severe psychological trauma in the bank employees he encountered. The defendant didn't just rob banks. He intentionally inflicted severe psychological injury on victims like JL, DD, NW, AS, and JP. The defendant knew that his actions would harm victims—he had perfected a plan that relied upon terrorizing his victims. The psychological injuries created by the defendant strongly suggest that a 45-year sentence is necessary to reflect the seriousness of the offense and to provide just punishment for the offense.

    **C.    The Defendant's History Weighs Strongly in Favor of a 45-Year Sentence.**

        **1.    Bank Robberies Committed Prior to the Instant Offense**

By the time the defendant stepped into the First Commercial Bank and attempted the first bank robbery charged in this case, he was already an experienced bank robber who had developed a successful method of executing takeover-style bank robberies. A cooperating individual who served federal prison time for bank robbery provided the government with detailed information about four bank robberies that he committed with the defendant in 2004 and 2005. Two of those bank robberies were charged in the original indictment in this case.[2] A report of a proffer with the cooperating individual is attached as Exhibit A.[3]

---

[2] When the government filed the superseding indictment, it chose not to include the two counts that were based on the testimony of the cooperating individual.

[3] This proffer was conducted while the cooperator was serving a sentence for bank robbery. The cooperator did not receive any benefit in exchange for his attempt to cooperate. Information provided by the cooperator was corroborated by other facts uncovered by the FBI's investigation. The cooperator previously provided information to the government regarding the defendant's history of robbing banks on multiple occasions.

11

As the proffer indicates, the cooperator's account of the bank robberies is detailed, specific, and contains aspects of the defendant's modus operandi that continued into the bank robberies charged in this case. In the first bank robbery discussed by the cooperator, the defendant and the cooperator wore suits and carried what appeared to be guns, just as the defendant did in the third charged robbery. Ex. A at 1. The defendant also grabbed a bank employee and went behind the counter, as he did in the second and third charged bank robberies. *Id*.

In the second bank robbery described by the cooperator, the defendant wore a suit and panty hose over his face, which is similar to what he wore in the third charged robbery. *Id.* at 2. Before this bank robbery, the defendant went to the thrift store to purchase old clothes to use as a disguise, like he did before the second charged robbery. *Id*. In addition, like the fourth charged robbery, the defendant saw a man in front of the bank, who the defendant caused to be marched into the bank at gunpoint. *Id.* The defendant also ordered bank employees to the floor and then ordered a bank teller to open the safe, like he did in the second and third charged robberies. *Id*.

During the third bank robbery described by the cooperator, the defendant wore a stocking mask and carried what appeared to be a gun, like the defendant did in the third charged robbery. *Id.* at 3. Like the fourth charged robbery, the defendant grabbed someone outside the door of the bank and dragged him inside. *Id*. The defendant also grabbed a bank employee and forced him to open the safe, as he did in the second and third charged robberies. *Id*.

The description of the bank robberies by the cooperator further reveals the defendant's planning and sophistication. According to the cooperator, the defendant used a police scanner with an earpiece so he could hear if law enforcement was coming to the bank. *Id*. at 1-3. During one robbery, the defendant spoke with an accent to disguise himself. *Id*. at 1. The defendant and his accomplices used stain remover and a washing machine to remove dye stains from the money they stole. *Id*. at 1-3.

The defendant's history of committing violent bank robberies in 2004 and 2005, combined with his commission of the four bank robberies in the instant case, indicates that he has no respect for the law and is a serious threat to the community. This factor weighs heavily in favor of a 45-year sentence.

### 2. Defendant's Criminal History

The defendant is a career criminal in the truest sense of the word. Even putting aside the uncharged 2004 and 2005 bank robberies, or the instant offenses, the defendant has 22 prior convictions and adjudications. PSR ¶¶ 78-99. On top of that, he has 29 additional arrests, starting at age 11. *Id*. at ¶¶ 107-135.

Although the defendant is a career offender and is in Criminal History Category VI, the Guidelines understate the seriousness of his criminal history. The defendant's convictions give him a criminal history score of 21. PSR ¶ 100. To establish a criminal history category of VI, only 13 criminal history points are required. The defendant's criminal history score is literally off the chart. If there was a category IX, the defendant would be in it.

The defendant's extensive criminal history strongly suggests that he lacks respect for the law and will continue to commit violent crimes when he is not incarcerated. The defendant has committed violent crimes even while under supervision—only incarceration or the defendant's advanced age after a lengthy term of incarceration can protect the public from further crimes of the defendant.

### 3. Defendant's Escape From the Metropolitan Correctional Center

The defendant's lack of respect for the law and the danger he represents to the public was further demonstrated by his well-planned escape from the Metropolitan Correctional Center.[4] After the guilty verdict at trial, defendant was returned to the custody of the Bureau of Prisons at the Metropolitan Correctional Center to await sentencing. Defendant was housed in the same cell together with another bank robbery defendant, Kenneth Conley. Four days later, at around 10:00 p.m. on December 17, 2012, a physical head count of the inmates in the tiers at the MCC was conducted, and both Conley and the defendant were present at the MCC on their assigned tier.

At approximately 7:00 a.m. on December 18, 2012, as MCC employees were arriving at work, they observed what appeared to be a rope hanging from a window

---

[4] If the defendant contests the fact of his escape from the MCC, the government will prove that fact at sentencing. The fact of the defendant's escape need only be proven at sentencing by a preponderance of the evidence. *See*, *e.g.*, *United States v. Lucas*, 670 F.3d 784, 790 (7th Cir. 2012) (district court may consider a wide range of conduct at sentencing, including acquitted conduct and dismissed offenses, if that conduct is proved by preponderance of the evidence) (citations omitted). *See also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").

14

on the south side of the MCC building. A physical head count of the MCC inmates was then conducted, and MCC officers searched the cell to which both Conley and the defendant were assigned. Neither Conley nor the defendant was present in the cell. Moreover, both beds in the cell contained numerous articles of clothing and sheets that were collected together under a blanket and appeared to be in the shape of a body. The window in the cell was broken and had a makeshift rope tied to its bars. The rope made of bed sheets and dental floss was hanging out of the window and down the side of the MCC building. Metal bars from the cell window were found in a mattress in the cell bed, and fake metal bars were also found in the cell. A search of the MCC was conducted and neither Conley nor the defendant were present in the facility.

For three days, the FBI, the United States Marshals Service, the Chicago Police Department, and other law enforcement agencies expended significant resources to investigate the defendant's escape and to find the defendant. During the time that the defendant was at large, he once again struck fear in the bank employees that he had terrorized over four years earlier. Teller DD, who collapsed and suffered a panic attack after watching the defendant hit his colleague JL over the head with a pistol, said that the defendant's escape made him concerned that the defendant could be looking for him. PSR ¶ 26. As for JL, who quit his job on the day of the robbery and suffers from post-traumatic stress disorder due to the incident, he said he experienced a great deal of fear when he learned of the

15

defendant's escape.  *Id*. at 25.  The government intends to present additional evidence of the effect of the defendant's escape on victims at sentencing.

On December 20, 2012, at 11:20 p.m., the defendant was arrested by the FBI at a residence in the Lincoln Park neighborhood of Chicago.  After his arrest, the defendant told law enforcement officers that they could read about his escape in his book.  The defendant was charged by complaint with escaping from federal custody in Case Number 12 CR 986, but the charges were later dismissed without prejudice.

As the Probation Department determined in the PSR, the offense level for each of the counts is increased by two points due to the defendant's escape from custody.  PSR ¶¶ 38, 48, 57, 65.  If the defendant had not escaped from custody, the advisory Guidelines range would have been 292 to 365 months, instead of 360 months to life imprisonment.

Even if the defendant had not escaped from prison, he would have merited a sentence at the high-end of the advisory Guidelines range—365 months.  Given that the defendant executed a well-planned escape from federal prison—scaring victims, witnesses, jurors, and the general public in the process—a significantly higher sentence is warranted.  The defendant's escape from federal prison just four days after he was convicted underscores his danger to the community and lack of respect for the law, and strongly suggests that a 45-year sentence is warranted.

> **D.  The Defendant's Failure to Accept Responsibility For His Actions Demonstrates the Need for a 45-Year Sentence to Deter Him and Others from Committing Violent Crime.**

The defendant has never accepted responsibility for the bank robberies he committed.  Both during and after the trial, the defendant pointed the finger at law

16

enforcement for setting him up. Moreover, after his escape from the MCC, the defendant has corresponded with members of the media and has blamed the MCC and the Bureau of Prisons for his own escape from custody.

To be sure, the defendant had the right to plead not guilty and require the government to prove his guilt beyond a reasonable doubt, which the government did. Similarly, the defendant has the right to contest the fact of his escape from prison. However, the defendant's attempts to blame others for his own actions represent part of his history and characteristics, and should be considered by this Court at sentencing. The defendant's public statements underscore the need for general deterrence—his statements may embolden others to engage in similar violent crimes or prison escapes.

On September 26, 2013, WLS-TV's ABC 7 News and the Chicago Sun-Times published stories about the defendant's correspondence with them. The Sun-Times story is attached as Exhibit B. Both stories were based upon a letter provided to the media by the defendant, which was published by the Sun-Times.

In the letter, the defendant states that he should receive no credit for the prison escape, and that "[a]ll credit is due to the MCC." The defendant blames the MCC for assigning him to a cell that provided him with the "perfect exiting route, due to it's [sic] south-facing orientation in connection to the building."

The defendant admits the facts of the escape in the letter, stating that he was "probably numb the whole while making my way towards the ground" and at times "losing and catching my grip at stop-and-go intervals." The defendant said that his

17

"legs up and giving [sic] out on me" and that he "collapsed my body to the pavement upon contact."

But the defendant makes the outrageous claim that he was not a "willing participant" in the escape because MCC officials took actions that "attributed greatly to the success of the 'supposed escape.'" In the letter, the defendant provides details of various decisions made by the MCC that he claims are sufficient to absolve him of responsibility for his own actions. The defendant concludes that because prison security did not prevent his escape, so we should "no longer refer to this event as an 'escape'" at all.

In the letter, the defendant also admits that his outlandish behavior before and during the trial in this case was nothing more than a manipulative act. After calling the escape "merely making a statement, my cry for help," the defendant said that "the same goes for the Moorish Sovereign act put on by me in court at trial days earlier—in retaliation, as a result or direct effect of … the potentially present but unknowable future that lie ahead. The clear and present danger."

In the years between the defendant's arrest and his conviction, the defendant repeatedly fired his attorneys and delayed the trial. Shortly before this trial, after firing his current attorneys, the defendant filed numerous bizarre documents and tried to derail the trial proceedings. He refused to directly answer this Court's questions and inquiries, refused to acknowledge or consult with standby counsel, declared a mistrial and engaged in numerous outbursts, repeatedly disregarded this Court's instructions and admitted to willfully disregarding them, and shouted

18

throughout the government's rebuttal argument. The defendant's actions spoke volumes about his lack of respect for the law. But the defendant's admission that the circus he created was nothing more than an "act" on his part speaks even louder—he has no respect for this Court or the judicial process.

Given the defendant's behavior before, during, and after trial—as well as his life-long history of committing serious crimes—there can be no question that a very lengthy prison term is necessary to deter this defendant from committing further crimes. Moreover, the defendant, through his statements to the media, has sought and attained a wide audience for his defiant and disrespectful attitude towards the law and the judicial process. A 45-year sentence would send the message—not only to the defendant, but also to the general public—that repeatedly committing violent crimes that seriously harmed victims, and escaping from federal prison afterward, will land you back in prison with a significantly longer sentence than you otherwise would have received.

### III. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 45 years' imprisonment.

Dated:   October 4, 2013            Respectfully submitted,

　　　　　　　　　　　　　　　　　　GARY S. SHAPIRO
　　　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　　　By:    */s/ Renato Mariotti*
　　　　　　　　　　　　　　　　　　RENATO MARIOTTI
　　　　　　　　　　　　　　　　　　SHERI H. MECKLENBURG
　　　　　　　　　　　　　　　　　　PETER S. SALIB
　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　219 South Dearborn Street, 5th Floor
　　　　　　　　　　　　　　　　　　Chicago, Illinois  60604
　　　　　　　　　　　　　　　　　　(312) 886-7855